**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: September 27 2019**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 18-31471 |
| | ) | |
| Jeremy N. Waite, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 18-3061 |
| | ) | |
| Charles Horvath, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Jeremy N. Waite, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OF DECISION</u>

This adversary proceeding is before the court for decision after trial on Plaintiff Charles Horvath's ("Plaintiff" or "Horvath") complaint to determine the dischargeability of a state court judgment debt owed to him by Defendant Jeremy Waite ("Defendant" or Waite"). Defendant is the debtor in the underlying Chapter 7 case, in which he has received his discharge. Plaintiff contends that Defendant owes him a debt resulting from fraudulent representations and willful and malicious conduct around replacement of the roof on Plaintiff's home, and that the debt should be excepted from Defendant's Chapter 7 discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(6).

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) as a civil proceeding arising under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable to this adversary proceeding under Rule 7052 of the Federal Rules of Bankruptcy Procedure. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the three witnesses, considered all the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Defendant is entitled to judgment in his favor.

## FINDINGS OF FACT

Jeremy Waite was a salesperson for Rock Roofing, LLC ("Rock Roofing"). Waite began working for Rock Roofing in 2014. Rocky Conley, owner of Rock Roofing, paid Waite a flat salary of $1,500.00 a week and supplied him a vehicle. Waite testified that Rock Roofing did not deduct taxes from his pay nor did it provide him with a W-2 or 1099 for income tax purposes. Rock Roofing was located at 3726 Lincolnshire Boulevard, Toledo, Ohio. Waite was provided with potential customer addresses by the company, and he then met with customers, provided job estimates, and secured customer contracts. Waite did not report to work at the Lincolnshire address unless he was picking up paperwork or supplies.

In January 2016, Horvath contacted Rock Roofing regarding replacement of the roof on his home. Rock Roofing sent Waite to Horvath's home to discuss installation of a new roof. After his discussions with Waite, on January 4, 2016, Horvath entered into a contract ("Contract") [Pl. Exhibit B, Attachment A] with Rock Roofing for the replacement of his roof. The Contract provided for removal of the old roof, replacing bad wood, and preparing and installing a new roof. A lifetime warranty on shingles by Owens Corning was included, as was a warranty on the workmanship. The Contract also provided for removal and reinstallation of the existing Gutter Helmet system. The contract amount was $7,500.

The work began and was completed by Rock Roofing on January 6, 2016. Waite did not himself do the work on the roofing job. Horvath subsequently contacted Waite to inform him of tar marks left on three pieces of siding. A crew was sent to Horvath's home and used citrus shine to remove the tar marks. But a sheen remained on the siding where the tar had been removed. Waite, at the direction of

Rocky Conley, then wrote up another work order, which specified that Rock Roofing would have American Power Clean power wash the house to remove the sheen on the siding at no additional cost to Horvath. [Pl. Ex. B, Attach. A, p. 3]. Horvath was also given a $500 credit off the total contract price for that inconvenience. Additionally, the work order stated that if the power washing was unsuccessful, Rock Roofing would look at other avenues to address the mess. The power washing was not successful and thereafter, Horvath wanted only to deal with Rocky Conley and not Waite anymore. Rock Roofing took no additional measures to correct the problem with the siding on Horvath's house.

According to Horvath, there were problems other than just the tar marks on the siding. Horvath ended up hiring and paying a third party to replace the siding. The contractor who replaced the damaged siding pointed out to him damage to the gutter protection system, as well as a wave in the roof over his porch. This turned out to be rotted wood underlayment, which had not been replaced prior to the new roof being installed by Rock Roofing. Finally, Horvath's air conditioner cover was torn by the Rock Roofing work crew. Horvath also paid Gutter Helmet to fix the damage to his gutter protection system.

The Contract provided that a warranty packet would be provided to Horvath following registration of the roof with Owens Corning. Rock Roofing did not register the roof with Owens Corning. Horvath eventually contacted Owens Corning himself to register the roof and to receive the promised warranty packet.

Waite ceased working for Rock Roofing on June 22, 2016, due to disputes with Rocky Conley. One of those disputes involved the job for Horvath, as Defendant explained that he felt Rocky Conley did not want to take care of the Horvath job "properly." Waite and Rocky Conley parted company "on bad terms." Waite turned to truck driving to earn a living after leaving Rock Roofing.

In July 2016, Horvath filed suit in an Ohio state court against Rock Roofing, Rocky Conley and Waite, alleging five claims against them, including one under the Ohio Consumer Sales Practices Act, *Horvath v. Rock Roofing, LLC, et al.*, Case No. CI201603506 (Lucas County). [Pl. Ex. B]. In December 2016, the state court granted a default judgment to Plaintiff as follows:

> [T]he Court awards Judgment in favor of Plaintiff Charles Horvath against Defendants Rock Roofing, LLC, Rocky Conley, and Jeremy Waite, jointly and severally, in an amount of $8,008.31 for actual damages which consists of $6,800.00 to re-side plaintiff's house, $608.00 to repair plaintiff's gutter helmet, $300.00 to repair the front porch roof, $150.00 for inspection of the siding, $49.31 to repair the air conditioner cover, and $101.00 for the City of Toledo Building Inspection, with treble damages, for an aggregate amount of $24,024.93 plus $5,000.00 for non-economic damages and attorney fees in the amount of

3

$4,227.50 with interest and court costs.

[*See* Pl. Ex. C].

The owner of Rock Roofing, Rocky Conley, paid Horvath $16,600 pursuant to a settlement agreement. Horvath filed a notice for a debtor's examination as he sought to collect the judgment balance of $16,652.43 from Waite.   [Pl. Ex. H].

Waite credibly testified that he was never served with a copy of the state court complaint.   Waite was not aware of the judgment against him until he received in July 2017 a notice of a debtor's examination in aid of execution. [Pl. Ex. H]. The notice of the Debtor's Examination was sent to Waite at 217 Woodland Avenue, Swanton, Ohio, which is his mother's address.   At the time of the debtor's examination, Waite's address was 10487 County Road Four, Lot 67, Swanton, Ohio.

The Debtor's examination was held on August 24, 2017, at the Lucas County, Ohio Common Pleas Courthouse. Waite, Horvath, Randy Dixon (state court counsel for Horvath), and April Oglesbee (Waite's mother) attended the session. Waite testified that he advised Horvath and his counsel that he planned to file for bankruptcy as soon as he was able to save up the money to do so.   Waite also informed Horvath and his counsel that Rock Roofing did not actually do the work, rather the work was done by a Wagner Roofing crew, a practice sometimes used by Rocky Conley. It was also at this session that Waite first learned of the damage to the Gutter Helmet system and the air conditioner cover.

At the Debtor's exam session, terms of a settlement agreement ("Agreement") [Pl. Ex. D] were discussed. The Agreement set out three terms: Waite would cooperate with a suit by Horvath against Wagner Roofing; Waite would pay the full balance of the judgment when and   if he was successful in a claim (for back wages) against Rock Roofing or Rocky Conley; and Waite would pay Horvath $100.00 a month, starting in October 2017, and continue payment until $6,000.00 was paid, at which time Horvath would enter a satisfaction of judgment.   Waite testified he was not represented by counsel at the Debtor's Examination and informed Plaintiff, and his counsel, that he did not have sufficient funds to make the payments and intended to file bankruptcy.   Waite credibly testified that, at this session, Horvath's counsel examined financial documents Waite brought with him and concluded that Waite did appear to qualify for unspecified bankruptcy relief.

Based on the terms of the proposed Agreement, Horvath ceased formal collection efforts against Waite.   Horvath denies that Waite informed him he was intending to file for bankruptcy.

After the debtor's examination, Horvath initiated suit against Wagner Roofing but ultimately dismissed the action because Waite could not be located in order to provide evidence to support the

4

claims.

Although Waite and his wife in November 2017 bought a used 2005 truck on credit (less a $200 cash down payment) [Plf. Ex. J], Horvath failed to receive any payments from Waite following the August 24, 2017, debtor's examination. In January 2018, Horvath filed documents in the state court to revive formal collection action on the judgment against Waite. [*See* Pl. Ex. O]. Waite filed his Chapter 7 bankruptcy case in this court on May 8, 2018, [Case No. 18-31471], stopping those efforts.

## LAW AND ANALYSIS

A discharge under Chapter 7 of the Bankruptcy Code is subject to the exception of certain types of debts listed in 11 U.S.C. § 523(a). *Stamper v. United States (In re Gardner)*, 360 F.3d 551, 557 (6th Cir. 2004). Horvath's non-dischargeability complaint in this court raises two of those exceptions. First, the complaint asserts that the judgment debt should be excepted from discharge under § 523(a)(2) because of conduct by Waite involving false representations. Second, the complaint asserts that the judgment debt should be excepted from discharge under § 523(a)(6) because of conduct by Waite that was willful and malicious.

The statutory exceptions are intended to implement the fundamental bankruptcy policy of affording a "fresh start" only to "the honest but unfortunate debtor." *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). In order to implement the fresh start policy, the exceptions to discharge for debts listed in § 523(a) are to be construed narrowly. *Rembert v. AT&T Universal Card Svcs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). Horvath, as the creditor seeking exception of a debt from Waite's Chapter 7 discharge, has the burden of proof under § 523(a)(2) and (a)(6) by a preponderance of the evidence. *Grogan,* 498 U.S. at 291.

The evidence at trial raises two separate inflection points at which the claimed exceptions from discharge must be applied: (1) the inception of the Contract between Rock Roofing and Horvath and (2) the post-judgment payment Agreement at the judgment debtor's examination. *See Murphy v. Snyder (In re Snyder)*, --F.3d--, No. 18-1578-bk, 2019 WL 4308631at *6 (2d Cir. Sept.12, 2019)(applying *Cohen v. De La Cruz,* 523 U.S. 213 (1998) and finding that "nothing in *Cohen* bars a court from determining whether only a portion of a contested debt 'arose from' the amounts obtained through defalcation, and is thus nondischargeable"). In turn, two separate avenues of proof were raised at trial with respect to each exception and each transaction: (1) issue preclusion based on the state court judgment and (2) other direct evidence of record at trial. The court will structure its analysis to address both statutory exceptions as applied to both transactions involving the parties and both methods of proof.

5

## I. Nondischargeability Claim Under § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services, . . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." Plaintiff's nondischargeability complaint is premised upon alleged fraudulent misrepresentations made by Waite. In order to except a debt from discharge under § 523(a)(2)(A) based on a false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss. *Rembert*, 141 F.3d at 280-81.

A debtor's intent to deceive a creditor is measured by a subjective standard and must be ascertained through review of the totality of the circumstances at hand. *Id*. at 281-82. A finding of fraudulent intent may be based on circumstantial evidence or from the debtor's "course of conduct," as direct intent proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "'[i]f there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor.'" *Jones v. Lawson (In re Lawson)*, No. 05-3246, 2007 WL 1192453 (Bankr. N.D. Ohio Apr. 23, 2007) (quoting *ITT Fin'l Servs. v. Szczepanski (In re Szczepanski)*, 139 B.R. 842, 944 (Bankr. N.D. Ohio 1991)).

### A. Issue Preclusion: Rock Roofing Contract Transaction

A primary issue is the effect of the state court default judgment in this proceeding. Issue preclusion[1] principles apply to dischargeability proceedings in bankruptcy cases. *See Grogan*, 498 U.S. at 284 n.11 ("[C]ollateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). Under 28 U.S.C. § 1738, the federal full faith and credit statute, a federal court must accord a state court judgment the same preclusive effect the judgment would have in state court. *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 703 (6th Cir. 1999). In determining whether a state court judgment should be given preclusive effect in a federal action, a federal court must apply the law of the state in which the prior judgment was rendered. *Id*. In this case, the court must apply Ohio issue

---

1 As noted by the Sixth Circuit in *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 703 (6th Cir. 1999), the United States Supreme Court in *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984), expressed a preference for the term "issue preclusion" over "collateral estoppel." In this opinion, those terms may be used interchangeably.

preclusion principles.

Under Ohio law, there are four requirements for the application of the doctrine of issue preclusion: (1) a final judgment on the merits after a full and fair opportunity to litigate the issue; (2) the issue was actually and directly litigated in the prior action and must have been necessary to the final judgment; (3) the issue in the present suit must have been identical to the issue in the prior suit; and (4) the party against whom estoppel is sought was a party or in privity with the party in the prior action. *Sill v. Sweeney (In re Sweeney)*, 276 B.R. 186, 189 (B.A.P. 6th Cir. 2002) (citing *Gonzalez v. Moffitt (In re Moffitt)*, 252 B.R. 916, 921 (B.A.P. 6th Cir. 2000)); *Thompson v. Wing*, 70 Ohio St.3d 176, 183 (1994). The party asserting issue preclusion carries the burden of proving its requirements by a preponderance of the evidence. *Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 535 (Bankr. S.D. Ohio 2008).

Waite as the party against whom collateral estoppel is sought in this court was a party defendant in Horvath's state court lawsuit, meeting the fourth element required under Ohio law for application of issue preclusion. But that is the only element of the four that Horvath has established.

As to application of the first element identified in *Sweeney*, while there is a final state court judgment against Waite, [Pl. Ex. C], the court finds that Horvath has not proven by a preponderance of the evidence that Waite had a full and fair opportunity to litigate the issues in the state court action. A full and fair opportunity to litigate "is rooted in due process concerns. . . [t]herefore, for purposes of collateral estoppel the key to full and fair opportunity analysis is determining whether the party had adequate notice of the issue and was afforded opportunity to participate in its determination." *South Atlantic Neurology and Pain Clinic, P.C. v. Lupo (In re Lupo)*, 353 B.R. 534, 553 (N.D. Ohio 2006) (citing *Lusk v. Williams (In re Williams)*, 282 B.R. 267 (Bankr. N.D. Ga. 2002)).

Waite testified that he did not have knowledge of any litigation against him, let alone the judgment, until he was noticed for a debtor's exam, seven months after a default judgment was entered against him and the other defendants in the state court litigation. The court finds this testimony credible, including because it is bolstered by documentary evidence. The state court complaint, filed on July 15, 2016, lists Waite's address as the business address of Rock Roofing. [Pl. Ex. B]. Waite testified that he did not regularly report to the Lincolnshire address and in any event had ceased working for Rock Roofing in June 2016. In addition, Waite testified that the return receipt card for service of the state court complaint sent to 3726 W. Lincolnshire Blvd., Rock Roofing's business location, appeared to be signed by Rocky Conley. *See Sweeney*, 276 B.R. at 190-191 (noting the importance under Ohio law of service

7

at a business address with "[*t*]*he key issue [being] the physical presence of the party being served at the business address.*") (citing *Bell v. Midwestern Educ. Servs., Inc.*, 89 Ohio App.3d 193, 202 (1993) (emphasis in original)).   Here, the evidence does not show proper service of the state court complaint on Waite. Defendant's Exhibits 1 and 2 show several attempts at service of unknown documents at various addresses over time, all unsuccessful. Horvath failed to prove that Waite received proper notice of the state court lawsuit or that Waite was afforded the opportunity to participate in its adjudication prior to the judgment being entered against him. The court finds that Plaintiff has not established by a preponderance of the evidence the first element of issue preclusion under *Sweeney*.

The second element of issue preclusion set forth in *Sweeney*--whether the issue(s) to which preclusive effect is sought to be afforded were actually and directly litigated in the prior action and must have been necessary to the final judgment--also fails. The Bankruptcy Appellate Panel in *Sweeney* addressed the considerations given to a default judgment in order to afford it preclusive effect under Ohio law:

> First, the plaintiff must actually submit to the state court admissible evidence apart from his pleadings.   In other words, a plaintiff's complaint, standing alone, can never provide a sufficient basis for the application of the collateral estoppel doctrine.   Second, the state court, from the evidence submitted, *must actually make findings of fact and conclusions of law* which are sufficiently detailed to support the application of the collateral estoppel doctrine in the subsequent proceeding.   In addition, given other potential problems that may arise with applying the collateral estoppel doctrine to default judgments (e.g., due process concerns), this Court will only make such an application if the circumstances of the case would make it equitable to do so.

*Sweeney*, 276 B.R. at 193-94 (emphasis in original) (quoting *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 387 (Bankr. N.D. Ohio 1999)). Stated differently, "[t]o be entitled to preclusive effect, a judgment should have sufficient detail to enable a subsequent court to have a clear understanding of the prior court's ruling without having to speculate about the scope of the prior court's findings of fact and conclusions of law."   *Yust v. Henckel (In re Henkel)*, 490 B.R. 759, 781 (Bankr. S.D. Ohio 2013) (citing *Sweeney*, 276 B.R. at 194)).

The state court's Judgment Entry reflects on its face that affidavits and at least one exhibit were submitted at the damages hearing held in state court. [Pl. Ex. C]. Nevertheless, while the claims in the state court complaint included violations of the Ohio Consumer Sales Practices Act, breach of warranty, breach of contract, breach of duty to perform in a workmanlike manner, and negligence, the state court's Judgment Entry says only that the hearing was on Plaintiff's Motion for Damages and Reasonable

8

Attorney's Fees. There are no findings of fact or conclusions of law from which Waite specifically can be determined to have done or not done anything. It did not address any of the five specific claims in the complaint.

The only claim in the state court complaint that even touches on unfair and deceptive acts is Horvath's First Claim brought under the Ohio Consumer Sales Practices Act. [Pl. Ex. B, pp. 3-5]. This court can infer from the nature of the damages awarded in the judgment entry as including treble damages and attorney's fees that the state court is ruling on that claim. *See* Ohio Rev. Code § 1345.09(B) and (F). But the statute is not mentioned by name or citation. And beyond just the damages award amounts, there is no information in the state court's two paragraph entry to tell this court anything about what factual findings the court had in mind, let alone made, to sustain its award of damages. *See Launder v. Doll (In re Doll)*, 585 B.R. 446, 457-58 (Bankr. N.D. Ohio 2018) (finding that state court default judgment on a claim brought under the Ohio Consumer Sales Practices Act failed to satisfy the second element under *Sweeney* where the judgment made references to the claim but made no specific findings of material misrepresentation or fraud). That is problematic because the unfair and deceptive acts alleged in the state court complaint range far beyond what can be characterized as fraud or misrepresentation. The court finds insufficient detail in the state court judgment entry, even when taken together with the complaint, to find that facts were actually and directly litigated in state court and necessary to support the default judgment so as to support application of issue preclusion in this action. Horvath has failed to present evidence to sustain his burden of proof by a preponderance of the evidence as to the second element of issue preclusion under *Sweeney*.

The third element prerequisite under Ohio law to application of issue preclusion from a prior action is an identity of the issues between the two actions. The elements of proof necessary to sustain a nondischargeability action based on false representations include a debtor's intent to deceive the creditor and justifiable reliance by the creditor. Again, the only claim in Horvath's state court complaint that even approaches the vicinity of fraud is the claim brought under the Ohio Consumer Sales Practices Act. However, neither an intent to deceive nor justifiable reliance are required to prevail on claims of unfair or deceptive consumer sales practices (including violations of the Home Solicitation Sale Act, see Ohio Revised Code § 1345.28) under Ohio Revised Code § 1345.02 or claims of unconscionable acts or practices under Ohio Revised Code § 1345.03. *Longbrake v. Rebarchek (In re Rebarchek)*, 293 B.R. 400, 408 (Bankr. N.D. Ohio 2002) (quoting *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 190, 711 N.E.2d 1088 (Ohio 1998)); *Nyman v. Simon de Montfort (In re Simon de Montfort)*, No. 17-3009, 2017

WL 4582171 at *9 (Oct. 12, 2017)(quoting *Funk v. Montgomery AMC/Jeep/Renault*, 66 Ohio App. 3d 815, 823, 586 N.E.2d 1113 (1990)); *accord Walker v. Dominion Homes., Inc.*, 164 Ohio App. 3d 3385, 394, 842 N.E.2d 570 (2005). Moreover, both sections allow for acts in violation of the statute to occur "before, during or after the transaction," a standard broader than the requirement in the preamble of § 523(a)(2) that the debt at issue be "for money, property, services….to the extent obtained by" a false representation.

As Plaintiff failed to establish by a preponderance of the evidence three of the four requirements for application of collateral estoppel as to the state court judgment, this court cannot give it preclusive effect to prove his nondischargeability claim against Waite under § 523(a)(2)(A).

**B. Other Trial Evidence of Fraud: Rock Roofing Transaction**

Horvath's nondischargeability complaint in this action avers only the following representations made by Waite in connection with the original Rock Roofing transaction:

●"at the time Plaintiff entered into a contract with Rock Roofing LLC for the installation of a new roof…Defendant verbally promised that Plaintiff would be receiving a warranty packet from Owens Corning" [Doc. # 1, ¶ 9]

● "after Rock Roofing LLC caused Plaintiff's siding to be damaged by tar…Defendant promised that the resulting tar marks on Plaintiff's siding would be removed by power washing the house" [Doc. # 1, ¶ 12]

● "That on or about January 7, 2016, Defendant stated to Plaintiff in a written statement that 'if powerwashing [was] unsuccessful, we will look into other avenues'" [Doc. # 1, ¶ 13]

● "Defendant made further false and fraudulent representations concerning the roofing project performed by the Defendant [sic] with respect to the Plainitff [sic] home, including misrepresentations concerning warranties and repairs need [sic] for the roof" [Doc. # 1, ¶ 43]

The court will address each of these representations under § 523(a)(2)(A) by the standards set forth by the Sixth Circuit in *Rembert.*

**1. The Warranty Packet**

The court credits Horvath's testimony that this representation was material to the transaction and further finds from the evidence that Horvath justifiably relied on it in entering into the Contract with Rock Roofing. A warranty of this nature from a known and established shingle manufacturer is of obvious significance to price and quality in a roof replacement job, and Horvath's testimony communicated that fact. The court further credits Horvath's testimony that Rock Roofing did not supply the warranty packet

from Owens Corning, and that he had to obtain it on his own. Waite did not deny these facts. The court thus finds that the representation was false.

But there is no evidence at all in the record from which the court can conclude that Waite knew the warranty packet representation was false when he made it, or that he made it with gross recklessness as to its truth. By way of example, there is no evidence that this happened on other Rock Roofing jobs and that Waite was aware that it happened on other jobs, which would tend to show that Waite was aware of its falsity when he made it. The bare fact that Rock Roofing did not supply the packet as promised does not alone suffice to show that Waite knew Rock Roofing would not supply the Owens Corning warranty packet. Nor is there any evidence in the totality of the record from which the court can conclude that Waite made this representation to Horvath with the requisite intent to deceive him into entering into the Contract.

As to element 4 under *Rembert,* Horvath's loss arose from the careless job done by Rock Roofing on the project after the Contract was reached. The shingles were apparently Owens Corning shingles and Horvath eventually got the warranty packet for the shingles, albeit on his own. The only way in which this representation, which turned out to be false, can be said to be the proximate cause of Horvath's loss is that without it Horvath would not have hired Rock Roofing and the careless siding and gutter damage it caused would not have occurred. The court finds, however, that this is too tenuous and speculative a connection to be a proximate cause of Horvath's loss related to the roof project to the extent he seeks to tag Waite with it. Rather, "there must be' a direct link between the alleged fraud and the *creation* of the debt.'" *Haney v. Copland (In re Copeland)*, 291 B.R. 740, 767 (Bankr. E.D. Tenn. 2003)(quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 n.7 (1st Cir. 2001)) (emphasis added). The carelessness of the work crew did not have anything to do with the lack of an Owens Corning warranty packet and the misrepresentation made in connection therewith.

Horvath has established only element 1, and at that only in part, and element 3 under *Rembert*. Horvath has not proven by a preponderance of the evidence elements 2 and 4 under *Rembert*. Horvath has thus failed to prove his fraudulent misrepresentation claim against Waite with respect to his Contract with Rock Roofing and the warranty packet by a preponderance of the evidence.

### 2. The Two Power Washing Representations

Horvath has not proven by a preponderance of evidence any misrepresentation at all, let alone a fraudulent misrepresentation, with respect to the power washing and removal of the tar marks (and the sheen from other efforts to remove them) on the house siding. To the extent the testimony was that Waite

11

promised Horvath the power washing would work, it is undercut as overstated by the written representations on this subject set forth in Plaintiff's Exhibit A. Two arguable representations appear there: (a) Rock Roofing would have American Power Clean power wash the house to remove the luster on the panels the crew cleaned the tar off of and (b) if that didn't work, Rock Roofing—"we"—will look into other avenues.  There is no guarantee or promise that power washing would work, which it apparently did not. Indeed, the contemplation was that it might not. Only that power washing would be done at Rock Roofing's expense. And the testimony of both Horvath and Waite confirms that it was. No falsity there.

 Likewise there is no evidence from which the court can conclude that Rock Roofing did not "consider other avenues." Perhaps it did. Perhaps it did not. That's a general and non-committal statement in the first place, and one that the court cannot find from the record was falsely made. While Waite admitted that he did not ultimately think Rock Roofing did right by Horvath on the job, which he testified was one reason he quit working there, it's not clear from the record why he ultimately thought that.

The record lacks any evidence that Horvath relied on these representations, true or false, in any respect, justifiably or otherwise. These representations were made after Horvath and Rock Roofing had entered into the Contract. There is no evidence that Horvath did or did not do anything as a result of Plaintiff's Exhibit A and the power washing statements.

The record also lacks any evidence from which the court can conclude that Waite drew up Plaintiff's Exhibit A with the intent to deceive Horvath in any way. To the contrary, he was trying to fix the problems caused by the roofing crew's careless work. His ultimate parting of ways with Rocky Conley and Rock Roofing, including over this job, convinces the court precisely to the contrary.

The court concludes that Horvath has failed to prove any of the *Rembert* elements around the power washing statements. Horvath has failed to prove his fraudulent misrepresentation claim against Waite with respect to the Contract with Rock Roofing and the power washing and tar clean- up efforts by a preponderance of the evidence.

### 3.  Further False and Fraudulent Representations Concerning the Roofing Project

The conclusory statement in paragraph 43 of the nondischargeability complaint is too general to allow the court to conclude that Plaintiff has proven by a preponderance of the evidence any other fraudulent misrepresentations supporting his claim against Defendant under § 523(a)(2)(A).

At trial, however, one other potential misrepresentation involving the Contract arose. Under Rule 15(b) of the Federal Rules of Civil Procedure, applicable under Bankruptcy Rule 7015, an issue not raised

12

by the pleadings but tried by the parties' express or implied consent must be treated in all respects as if raised in the pleadings.

Trial testimony showed that Waite ultimately communicated to Horvath at the judgment debtor's examination that a crew from another roofing company had replaced Horvath's roof. While the Contract does not specifically represent who would be doing the job, it is a fair inference that Rock Roofing would not subcontract the job out to another company. Horvath indicated that he was impressed by Rock Roofing's signage and website, which led him to it in the first place. A subcontract would be a material fact that should have been communicated to Horvath in connection with the Contract, making its omission a potential fraudulent misrepresentation under § 523(a)(2)(A). Nevertheless, the record lacks any evidence from which the court can conclude that Waite was aware at the time he drew up the Horvath Contract that Conley was not going to have a Rock Roofing crew do the job. He did admit at trial that he was aware that Conley sometimes engaged in that practice. But unless Waite knew that fact before he got Horvath to sign the Contract and omitted to tell Horvath about it, the court also cannot find that Waite intended to deceive Horvath into signing on with Rock Roofing through any such omission. There is no such evidence in the record.

The bottom line is that Horvath is trying to take the fact that Rock Roofing breached its contract by doing a careless job on replacement of his roof and then failing to fix it successfully and turn it into fraud perpetrated by its non-commissioned salesman Waite. He has not succeeded in doing so.

### C. Issue Preclusion: Settlement Transaction

Quite simply, there can be no proof through issue preclusion of fraud by Waite within the ambit of § 523(a)(2)(A) as to the parties' settlement discussions because they all occurred post-judgment.

### D. Other Trial Evidence of Fraud: Settlement Transaction

The court will separately apply the *Rembert* elements for proof of a § 523(a)(2)(A) claim to the parties' settlement discussions. Again, those elements are the following: (1) the debtor obtained money, property, services or credit through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss. *Rembert*, 141 F.3d at 280-81.

As to the first *Rembert* element, Plaintiff argues that Waite entered into an Agreement with him at the August 24, 2017, debtor's examination that Waite never intended to perform. There is no dispute that Waite never made any $100 monthly payments to Horvath after the judgment debtor's examination.

13

And while a mere breach of contract will not support a finding of fraud, "any debtor who does not intend to perform a contract from its inception has knowingly made a false representation." *Stifter v. Orsine (In re Orsine),* 254 B.R. 184, 188 (Bankr. N.D. Ohio 2000); *Whitcomb v. Smith (In re Smith)*, 572 B.R. 1, 16 (1st Cir. B.A.P. 2017).

The court must decide whether the parties entered into a contract in the first instance. "A settlement agreement is a type of contract and is governed by reference to state substantive law governing contracts generally." *Cogent Solutions Group, LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013); *U.S. Trustee v. Halishak (In re Halishak)*, 324 B.R. 641, 643 (N.D. Ohio 2005). In Ohio, "[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and the legality of object and of consideration." *Manley Architecture Group, LLC v. Santanello*, 114 N.E.3d 697, 704 (Ohio App. 2018) (quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1 (2002)). Critical to the existence of a contract is a meeting of the minds as to both parties and "the contract must be definite and certain." *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). A determination whether there is a meeting of the minds or mutual assent is a question of fact to be determined by the court from a review of the entire record. *United National Mortgage v. Porrello (In re Porrello)*, 386 B.R. 206, 209 (Bankr. N.D. Ohio 2008).

Horvath's lawyer in the state court litigation sent a letter, dated August 29, 2017, to Waite regarding "discussion [] had concerning a compromise payment plan." [Pl. Ex. D]. The letter went on to discuss the details as to the "agreement [which] was reached." [*Id.*] It is undisputed Waite did not sign any written agreement. But an oral agreement may enforceable "if there is sufficient particularity to form a binding contract." *Kostelnik*, 96 Ohio St.3d at 3.

The court finds that the parties did enter into an oral settlement agreement with the terms as subsequently memorialized in Horvath's lawyer's August 29, 2017, letter to Waite, which Waite admits he received. [Pl. Ex D]. Both Horvath and Waite acknowledged at trial that the three points they had agreed to are summarized in the letter. The agreement was definite and certain. And notwithstanding Waite's testimony at trial that he didn't feel he had a choice but to enter into the agreement because Horvath's lawyer told him the judgment was final, he did not dispute any of the terms stated. The court finds that there was mutual assent. The consideration to Waite was a forbearance in trying to garnish his wages and a reduced judgment amount if he either paid $6,000 or turned over any amount he recovered from Rocky Conley on account of unpaid back compensation to pay off the judgment balance. There is

14

no evidence that Waite communicated back to Horvath's lawyer that he had not agreed to what was set forth in the August 29, 2017, letter. Notwithstanding that he did not have a lawyer, Waite displayed to the court that he had the capacity to enter into a contract with Horvath to payoff the judgment. Nor is there any issue about the legality of the object and of the consideration for the contract. Although the judgment was voidable due to lack of service of the summons and complaint on Waite, it had not been vacated. Waite's discovery responses also acknowledge an agreement between the parties. [Plf. Ex. M: Rqst. to Admit 1 (p. 6); Rqst, to Admit 4 (p. 7); Rqst. To Admit8 (p[. 8); Rqst. To Admit 13 (p. 9); Int. 11-14 (pp. 13-14)].

There being a contract between the parties, the next question is whether Waite intended to perform it at the outset. Although Waite did not file suit against Rocky Conley to recover unpaid compensation, the court credits his testimony that he sought counsel to file a claim on his behalf but was unsuccessful in doing so and thus never commenced an action against Rocky Conley. That he did not commence suit against Rock Roofing or Rocky Conley does not equate to evidence that he never intended to do so. Waite also listed such a claim in his bankruptcy schedules. [Pl. Ex. E, p. 6/35, Q. 33]. The Chapter 7 trustee did not pursue the claim either.

The court also finds that Horvath failed to prove that Waite never intended to cooperate in an action against Wagner Roofing over the botched roofing job. Horvath admitted they dismissed the Wagner Roofing lawsuit when they could not locate Waite. There was no term of the agreement implied or otherwise that Waite keep Horvath or his lawyer apprised of his whereabouts at all times.

The question whether Waite ever intended to pay Horvath $100 per month is a closer one. Waite testified that he did not misrepresent his intention to pay because he informed Horvath and his lawyer that he intended to file for bankruptcy relief as soon as he could get the funds together to do so. That statement also appears in Waite's discovery responses. [Plf. Ex. M]. Yet he still agreed to pay Horvath $100 per month, to the point that the lawyer sent him envelopes with which to make the initial payments. He never did make any payments.

This is the one material fact about which there is conflicting trial testimony. Horvath testified that Waite never told them at the judgment debtor's exam that he planned to file for bankruptcy relief. Waite and his mother, April Oglesbee, both testified that he did tell them that he intended to file for bankruptcy when he had the money to do so. The court finds it credible that Waite did communicate at the judgment debtor's examination his intention to file for bankruptcy. His mother corroborated his testimony. The proceedings involved testimony about his residence(s) and family situation and employment and

financial situation. As his bankruptcy schedules [Pl. Ex. E] and July-November 2017 bank records show [Pf. Ex I], he was uncollectible. He testified that Horvath's lawyer acknowledged as much. Thus, it was an entirely credible threat. The only collection avenue available against Waite was to garnish his wages, which is what Waite was really worried about. Bankruptcy would stop a garnishment. There is nothing about Waite's testimony and demeanor, or April Oglesbee's, at trial that causes the court to think they were lying on this point. Waite's discovery responses showed Horvath that Waite would so testify at trial. [Pl. Ex. M]. Horvath's demeanor at trial impressed the court   as displaying frustration and antagonistic bitterness, with a memory that was somewhat confused, at least about dates.

But the court's finding that Waite communicated to Horvath and his lawyer that he intended to file for bankruptcy does not absolve Waite in quite the way he thinks it does, which also convinces the court he is telling the truth. Instead the court finds that Waite never did intend to pay Horvath $100 per month through September 2022. Thus, Waite impliedly misrepresented his intention to perform the Agreement from the outset. Rather, Waite entered into the Agreement to buy time to get the money to file for bankruptcy relief. He admitted to being very concerned about garnishment of his wages.   The Agreement bought him time to get the funds together to hire a lawyer to file for bankruptcy relief and prevent a wage garnishment. Thus, the court also finds that Waite intended to deceive Horvath and his lawyer into backing off, for whatever time he could buy, by entering into an Agreement a material provision of which he never intended to perform.

The final two *Rembert* elements that Plaintiff must prove are (A) justifiable reliance; *i.e.,* that Horvath actually relied on Defendant's implied representation that he intended to make $100 monthly payments and, based on the facts and circumstances that he knew at the time, his reliance was justifiable and (B) that his reliance was the proximate cause of loss.

The Supreme Court held in *Field v. Mans*, 516 U.S. 59, 74-75 (1995), that excepting a debt from discharge under § 523(a)(2)(A) requires a creditor to establish that his reliance on a misrepresentation was "justifiable," which is a lower standard than "reasonable" reliance. An entity may be "justified in relying on a representation of fact 'although [it] might have ascertained the falsity of the representation had [it] made an investigation.'" *Id.* at 70 (citing Restatement (Second) of Torts § 540 (1976)). Unlike reasonable reliance, which requires a plaintiff's conduct to conform to the standard of the objectively reasonable person, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of application of a community standard of conduct to all cases." *Id.* at 71 (citing Restatement (Second) of Torts § 545A, cmt. b). The Supreme Court

16

also noted, however, that "[j]ustifiability is not without some limits." *Id*. The recipient of a fraudulent misrepresentation is "required to use his senses,  and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (quoting Restatement (Second) of Torts § 541, cmt. a). Quoting the example from the Restatement, the Supreme Court explained:

> [I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, [this rule] applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.

*Id.* (citing Restatement (Second) of Torts § 541, cmt. A).

As with intent, a court's determination of whether the plaintiff actually relied and whether the reliance was justified is subjective, "based on the facts and circumstances surrounding each individual case." *In re Copeland,* 291 B.R. at 766–67. "To constitute justifiable reliance, the plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." *Stewart Title Guar. Co. v. Roberts–Dude,* 497 B.R. 143, 151 (S.D. Fla. 2013) (citation, quotation marks, and brackets omitted); *Woodward v. Bethel (In re Bethel)*, 302 B.R. 205, 209 (Bankr. N.D. Ohio 2003) ("[R]eliance is not justifiable if the creditor blindly turns their eyes away from thing which would have clearly shown that any reliance on the debtor's representations was misplaced.").

The court finds based on the facts and circumstances surrounding the Agreement that Horvath did not justifiably rely on Waite's implied representation that he intended to make monthly payments to Horvath under the Agreement until 2022.

Horvath testified that absent the Agreement he was prepared to have his lawyer move ahead on collection of the judgment and that those efforts ceased based on the Agreement. Thus, the record shows reliance.

The real issue is whether that reliance was justifiable. The court finds that it was not. Key to the court's assessment are the facts that: (1) Horvath was represented by experienced and knowledgeable counsel (who did not testify at trial) throughout this process; (2) counsel was made fully aware of Waite's dicey financial situation at and through the judgment debtor's examination and that he was uncollectible except to the extent wages could be garnished; and (3) Waite vocalized his intention to both Horvath and

17

his lawyer to file for bankruptcy when he could get the money together to pay a lawyer. With the presence of experienced counsel for Horvath to guide and advise him, Horvath became the veritable "experienced horseman" cited in the Restatement example quoted by the Supreme Court in *Field v. Mans*. April Oglesbee testified that Horvath and his lawyer decamped to a separate room to confer privately during the judgment debtor's examination session. While the contents of that conversation between Horvath and Dixon are not known, Waite's dicey financial picture and his statement that he intended to file for bankruptcy relief when he got together the money to do so obliterated the idea that they were justifiable in relying on his intention to pay $100 a month for 5 years. In many § 523(a)(2)(A) cases, there is discussion about whether an investigation (to determine whether the horse has a bad eye, for example) would expose the falsity of a representation. In this case, the judgment debtor's examination was that investigation. Under the circumstances, Horvath's reliance on Waite's misrepresented intention to pay him $100 a month through September 2022 to forego an immediate wage garnishment was not justifiable. There was nothing about the whole situation that showed that Waite could and would make those payments. He told them he could not and would not. *Cf. Bethel*, 302 B.R. at 209-10 (where debtor was represented by legal counsel and did not give any verbal indication that, despite signing an agreement to the contrary, she would be unable to pay credit card obligations, creditor former spouse's reliance on promise was justifiable and debt was nondischargeable under §523(a)(2)(A)).

Lastly, under the fourth *Rembert* element, any justifiable reliance that occurred must be the proximate cause of the plaintiff's loss. "[P]roximate cause may be established by showing the conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow." *Sheen Falls Strategies, LLC v. Keane (In re Keane)*, 560 B.R. 475, 489 (Bankr. N.D. Ohio 2016) (citation omitted). Proximate cause is something more than what Plaintiffs might have done in a hypothetical circumstance; instead, it "depends on whether 'the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible.'" *Allen v. Smith (In re Smith)*, 567 B.R. 529, 539 (Bankr. M.D. Tenn. 2017) (quoting *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 370(Bankr. E.D. Mich. 2012) (citations omitted)). In other words, "there must be 'a direct link between the alleged fraud and the creation of the [liability].'" *Id.* Plaintiff has advanced two different potential losses, the unpaid judgment amount or the $6,000 Agreement amount. [*See* Doc. # 1, ¶¶ 28, 29, 47, 56].

The unpaid judgment amount arises from the initial Rock Roofing Contract, which the court finds above did not result from any fraud by Waite, and the default judgement, which was entered months before the separate Agreement and the negotiations surrounding it. *See Macaulay v. Shields (In re*

*Shields)*, 147 B.R. 627, 629-30 (Bankr. D. Mass. 1992) (debtor's false statement made subsequent to the creation of the debt [*i.e.* the judgment in this case] intended to placate the plaintiffs does not support nondischargeability pursuant to §523(a)(2)(A)). There is no evidence in the record showing that Horvath could have collected the whole unpaid judgment balance if Waite had not misrepresented his intention to make the $100 monthly payments for 5 years. Indeed, Waite was uncollectible and he communicated to them his intention to file for bankruptcy relief. There is no evidence his uncollectible status changed before he filed his Chapter 7 case.

The prayer for relief and counsel alternatively assert that the loss proximately resulting from Waite's misrepresentation of his intention to make $100 payments was the $6,000 reduced amount Waite agreed to pay. The flaw in that argument is that by January 2018 Horvath had resumed collection of the unpaid judgment amount from Waite through wage garnishment efforts. In his own mind Horvath did not actually give up the right under the judgment to collect the $16, 652.43 balance from Waite. Horvath made no effort to enforce the settlement Agreement itself to collect the reduced amount of $6,000. The resumption of wage garnishment efforts on the judgment show that the lawyer draftsperson of the Agreement letter construed the reduction in the balance owed by Waite to be conditioned on his making the payments. Instead Plaintiff's counsel's resumption of wage garnishment on the judgment indicates their view that the Agreement was of no further force and effect. The reduced collection amount of $6,000 was thus not a loss proximately caused by Waite's misrepresentation of his intention to make monthly payments to Horvath through 2022.

Rather, the loss proximately caused by Waite's misrepresentation of his intention to make the $100 monthly payments was the wages that Horvath could have garnished from Waite but for the misrepresentation. Although he changed jobs, Waite was employed in trucking throughout this time. The relevant time period for damages from the misrepresentation of intent to pay was from September 2017 through the resumption of garnishment proceedings in January 2018. The putative proximate loss was the garnishable portion of Waite's wages during that time. But the only paystubs in the record cover the time period from January 22, 2018, through May 6, 2018. [Pl. Ex. L]. (Other wage garnishments and a child support deduction are shown on those paystubs.) Horvath has not shown the court what amount of wages he could have garnished from Waite, if any, but for Waite's misrepresentation of his intention to make monthly payments that caused them to cease temporarily forced collection of the judgment.

The court concludes that Horvath has not proven by a preponderance of the evidence the third and fourth *Rembert* elements with respect to the settlement Agreement. His claim under § 523(a)(2) based

19

on that transaction fails as well.

## II. Nondischargeability Claim Under § 523(a)(6)

Section 523(a)(6) excepts a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" from a Chapter 7 discharge. 11 U.S.C. § 523(a)(6). To prevail under § 523(a)(6) Plaintiff must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-02 (Bankr. N.D. Ohio 2001). The "willful and malicious standard is a stringent one…." *Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 4 (6th Cir. 2004). The terms "willful" and "malicious" are distinct and both requirements must be met under § 523(a)(6*). In re Lupo*, 353 B.R. at 550.

Addressing the "willful" requirement of § 523(a)(6), the Supreme Court decided that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts" and held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). A willful injury occurs when "(i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004) (citing *Markowitz*, 190 F.3d at 464).

Under § 523(a)(6), "'malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Id.* (citing *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). "Stated differently, "[t]here must also be a consciousness of wrongdoing. . . It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6)." *Kraus Anderson Capital, Inc. v. Bradley (In re Bradley)*, 507 B.R. 192, 204 (B.A.P. 6th Cir. 2014) (quoting *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001)).

### A. Issue Preclusion: Rock Roofing Transaction

The same problems with applying issue preclusion based on the state court default judgment to Plaintiff's § 523(a)(2)(A) claim arise with respect to Plaintiff's § 523(a)(6) claim, only moreso.

The first element of issue preclusion under Ohio law requires that Waite have had a full and fair opportunity to litigate the issues raised in the state court action. That analysis is identical under §

523(a)(2)(A) and (a)(6). Horvath having failed to prove by a preponderance of the evidence that Waite received proper notice of the state court lawsuit or that Waite was afforded an opportunity to participate in it before the entry of a default judgment, the court finds that Plaintiff has likewise failed to establish by a preponderance of the evidence the first element of issue preclusion under *Sweeney* for purposes of his § 523(a)(6) claim.

The second element of issue preclusion under Ohio law, requiring that the issues to which preclusive effect are sought to be applied have actually been litigated in the prior action, fails for the same reason with respect to the § 523(a)(6) claim as it does with respect to the § 523(a)(2)(A) claim. There is insufficient detail in the state court judgment entry, even when taken together with the complaint, to support application of issue preclusion to find a willful and malicious injury committed by Waite at the inception of the Rock Rooking transaction.

The third element prerequisite to application of issue preclusion under Ohio law requires an identify of issue between the two actions. To prevail under § 523(a)(6) with respect to the Rock Roofing transaction, Horvath must prove that Waite intended that the roofing crew do a careless job or that he got Horvath to sign the Contract even with a substantial certainty that the job would end up that way. Again, the only claim in Horvath's state court complaint that even approaches bad acts, as opposed to breach of contract or negligence, is Horvath's Ohio Consumer Sales Practices Act claim. But the state court complaint lacks factual allegations, individually or collectively, that come anywhere near averring the level of intent to injure or belief in the certainty of injury from an intentional act required for this court to be able to find an identity of issues between the Ohio Consumer Sales Practice Act claim in the state court action and his § 523(a)(6) willful and malicious injury claim in this court. A plaintiff can win a claim under the Ohio Consumer Sales Practices Act, including for treble damages, without showing an intent to injure or consciousness of wrongdoing. Not so a § 523(a)(6) claim. There was no punitive damages award to Horvath in the state court, and with good reason. The averments of the state court complaint did not support one.

Plaintiff has failed to prove his § 523(a)(6) claim in this court through issue preclusion based on the state court default judgment.

### B. Other Evidence of Willful & Malicious Conduct: Rock Roofing Transaction

As explained above, the record lacks evidence of fraud committed by Waite in connection with getting Horvath signed up to the Rock Roofing Contract and the problems in performance and fixing the tar mess. And there is even less evidence to support a claim that Waite's conduct as Rock Roofing's non-

21

commissioned salesperson was willful and malicious in nature. Horvath's § 523(a)(6) claim requires that he prove that Waite knew that the roofing crew was not going to be a Rock Roofing crew, or that it would do a careless job and cause damage to Horvath's siding, gutter protection system and grill cover or that it would not properly fix the damage, and that Waite intended these injuries to Horvath's property occur, or at least disregarded a substantial certainty in his own mind that these screw-ups would happen. To the contrary, Waite's credible testimony was that he was upset about the mess and felt that Rocky Conley did not do right by Horvath, leading in part to his departure from the employ of Rock Roofing. That testimony is completely at odds with the argument that he knew what was going to happen and got Horvath to enter into the Contract anyhow.

### C. Issue Preclusion: Settlement Transaction

As with the § 523(a)(2)(A) claim, there can be no proof through issue preclusion of willful and malicious conduct by Waite within the ambit of § 523(a)(6) as to the parties' settlement discussions and Agreement because they occurred post-judgment.

### D. Other Trial Evidence of Willful and Malicious Conduct: Settlement Transaction

As explained above, the court agrees with Plaintiff that the parties entered enter a contract for settlement of Horvath's collection of the balance of the judgment against Waite. And the court has also determined that Waite impliedly misrepresented his intention to perform the provision of the Agreement requiring him to pay Horvath $100 a month through 2022 in exchange for a satisfaction of judgment at a lesser amount than the unpaid balance. There are two ways to view Plaintiff's arguments under § 523(a)(6) as applied to the Agreement; first, that Waite's breach was an intentional one or second, that the Agreement was part of a tortious scheme to thwart collection of Horvath's judgment.

As to the first argument, the Sixth Circuit noted in *Best*, 109 Fed. Appx. at 8, a case that also involved non-payment of a judgment debt that arose out of a breach of contract, that "[c]onsistent with *Geiger*, we have held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6)." In so doing it also cited *In re Bullock-Williams*, 220 B.R. 345, 347 (B.A.P. 6th Cir. 1998), where the court observed that a § 523(a)(6) violation encompasses more than just a "knowing breach of contract." And other courts have decided more explicitly that an "intentional" breach of contract is not enough to support a claim under § 523(a)(6), unless the debtor's conduct also gives rise to an independent tort. *United Providers, Inc. v. Pagan (In re Pagan)*, 564 B.R. 324 (Bankr. N.D. Ill. 2017); *cf. WLC Enterprises, Inc. v. Rylant (In re Rylant)*, 594 B.R. 783, 788 (Bankr. N.M. 2018)("It is the rare breach of contract case that comes within § 523(a)(6)."). In the Sixth Circuit's view, "[t]he conduct

'must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from….legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice...'" *Best*, 109 Fed. Appx. at 4(quoting *In re Mulder,* 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004)). Plaintiff has not shown any independent tort in connection with the Waite's breach of his obligation to make payments under the Agreement. In general, the basic failure to pay a debt, which is what the evidence shows occurred here, does not come within § 523(a)(6), *Rylant*, 594 B.R. at 789 (and cases cited therein), because "if the failure to pay a just debt were the only criteria that would qualify under this exception to discharge, then no debt would ever be dischargeable," *Ayoub v. Abdallah* (*In re Abdallah*), 2012 WL 631845, at *1 (Bankr. M.D. Pa. Feb. 27, 2012). Rather than intending to cause injury to Horvath, he was trying to protect himself.

Plaintiff argues, however, that Waite's conduct went beyond not just making $100 monthly payments to Horvath. Rather, counsel tries to portray the Agreement as part of a scheme to thwart collection of the judgment. The court disagrees. Plaintiff makes much of Waite's purchase of a car in November 2017 for his wife [Pl. Ex. J], as rhapsodically displayed on their Facebook pages [Pl. Ex. K], while he failed to make the $100 monthly payments to Horvath starting in October 2017. The court is much less troubled by this action than Plaintiff. The vehicle was a 2005 used truck acquired at a buy here pay here place with $200 down, an interest rate of 20.990% and weekly payments for which they were both liable. [Pl. Ex. J]. Waite testified credibly that the truck represented basic reliable transportation for the household, because they had no reliable vehicle. Given the state of Debtor's bank account [Pl. Ex I] as starting and ending overdrawn every month from July through November 2017, and the child support payments and other garnishments displayed on his later paychecks [Pl. Ex. L], the purchase of the truck does not equate in the court's view to an intentional withholding of available resources from Horvath, in essence a conscious and exacerbated disregard of Waite's obligation under the Agreement to make payments to Horvath. Rather than thumbing his nose at Horvath with the goal of intentionally injuring him, Waite's purchase of the truck represents an effort to secure basic household transportation. No tort there.

The court also finds *Best* instructive with respect to this argument. The judgment debtors in *Best*, who had been subject to garnishment of their bank account, sold assets, concealed the proceeds to keep them away from their judgment creditor and used the proceeds to pay their other creditors. In the face of that conduct, the Sixth Circuit held that "the bankruptcy court did not err in concluding that the Bests did not invade Steier's legal rights [as an unsecured creditor] by selling assets and using the

proceeds to pay other creditors instead of him." *Best*, 109 Fed. Appx. at *9. Similarly Waite was free to use his $200 as down payment on a 12 year old used truck instead of paying Horvath under the Agreement without creating a nondischargeable debt under § 523(a)(6). *See also Walker v. Alama (In re Alama)*, 500 B.R. 887 (Bankr. E.D. Tenn. 2013) (§ 523(a)(6) claim based on debtor's post-judgment transfer of real property to his wife and daughter fails where creditor is unsecured).

The court finds no evidence in the record from which it can find that Waite intended to injure Horvath and displayed a consciousness of wrongdoing in the process in connection with the Agreement. Waite was a pro se party summoned to a legal proceeding in a county courthouse trying to protect his paycheck from a default judgment where he was left with the impression from the other party's lawyer that he did not have any choice until he could get the money together to hire a lawyer to file for bankruptcy relief, an intention that the court finds he communicated to the other party. That Waite later bought a used 12 year old truck instead of paying Plaintiff does not change the court's view that his actions amounted to a breach of contract, and not more than that. This is not the "rare breach of contract" to which the court in *Rylant* refers that also violates § 523(a)(6). Plaintiff has failed to prove by a preponderance of the evidence a claim under § 523(a)(6) in connection with the Agreement.

## CONCLUSION

For the foregoing reasons, the court finds the Plaintiff has not proven by a preponderance of the evidence that Waite owes him a nondischargeable debt under § 523(a)(2)(A) or (a)(6). Accordingly, the court finds in favor of the Defendant on Plaintiff's nondischargeability adversary complaint. The court will enter a separate judgment in accordance with this Memorandum of Decision.

24